STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Ross.weingarten@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 19-00715-01 WHA |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| JOSE RICARDO LOZA, | Date: January 3, 2023 |
| Defendant. | Time: 1:30 p.m. |
| | Hon. William H. Alsup |

## I. INTRODUCTION

Beginning in August 2019, and continuing until his arrest in December 2019, defendant Jose Loza was a large-scale narcotics trafficker who sold significant amounts of fentanyl and heroin to a confidential informant ("CI") and an undercover law enforcement officer ("UC"). The transactions got progressively larger, starting with a deal for 50 counterfeit pills laced with fentanyl, and then moving on to ounces of heroin, followed by a final controlled purchase of 500 counterfeit fentanyl pills for $5,000. When law enforcement officers executed a search warrant at Loza's home on December 12, 2019, they found even more evidence of Loza's drug dealing: (1) 2,255 counterfeit fentanyl pills; (2) 181 grams of

suspected heroin; (3) 147 grams of marijuana, along with packaging and labels indicating it was for sale; (4) three grams of suspected methamphetamine; and (5) $5,480 in cash. The evidence garnered from this investigation clearly shows that in late 2019, Loza was a sophisticated poly-drug trafficker in the East Bay.

Along with two co-defendants who delivered drugs for him, Loza was charged in a Superseding Indictment on January 23, 2020 with various crimes related to his narcotics trafficking. Dkt. No. 41. Count Six of the Superseding Indictment charges Loza with Possession with Intent to Distribute more than 40 grams of fentanyl, which carries a five year mandatory minimum sentence. However, because Loza is eligible for the expanded Safety Valve, the Court is not constrained by the mandatory minimum at sentencing. On November 23, 2020, Loza pled guilty to all counts charged in the Superseding Indictment.

The parties and Probation are in agreement that the Total Offense Level is 27, Criminal History Category is IV, yielding an advisory Guidelines range of 100-125 months' imprisonment. However, the government believes that Loza is eligible for expanded safety valve, which the PSR does not take into account, meaning the defendant's Total Offense Level is 25. Accordingly, his advisory Guidelines range is 84-105 months. Probation recommends a sentence of 88 months imprisonment, which represents a downward variance from the range set forth in the PSR. The government agrees that a downward variance is applicable in this case, and believes that a 63 month sentence – which represents the low-end of the applicable Guidelines range after a three-level downward variance – is an appropriate sentence taking into account the relevant the 3553(a) factors. Therefore, the government recommends a sentence of 63 months in custody, to be followed by three years of supervised release and a $600 special assessment.

## II. DISCUSSION

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the defendant, and rehabilitate the defendant. 18 U.S.C. § 3553(a)(2); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The statute sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and

characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991. A sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment to the offender, deter the defendant and others from committing similar crimes in the future and protect the community from future crimes of the defendant. 18 U.S.C. § 3553(a)(2). The Guidelines should be the starting point and the initial benchmark. *Gall v. United States*, 552 U.S. 38, 49 (2007). Though the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). In this case, the applicable guidelines range is 84-105 months. The government believes that a sentence of 63 months achieves the goals of sentencing set forth in §3553(a).

### A. Loza's Conduct Shows he is a Large-Scale Trafficker

In August 2019, a CI informed law enforcement that Loza was a narcotics trafficker operating out of an autobody shop in Pittsburg, California. On August 22, 2019, the CI set up a deal to buy counterfeit pills laced with fentanyl from Loza. On the day of the deal, Loza and the CI had a miscommunication about how many pills were to be sold, and so Loza called his co-defendant, Randy Lee Walker[1], and had Walker deliver more pills to Loza. In total, Loza provided the CI with 50 counterfeit fentanyl pills. As the Court knows, counterfeit pharmaceutical pills that are laced with fentanyl are responsible for thousands of deaths in our community and around the country. These pills are so dangerous because they are manufactured to look like a different drug, in this case Oxycodone, and so the user often does not know they contain fentanyl, which is a potent and potentially deadly opioid. In fact, at the first controlled purchase in this case, Loza told the CI to be careful when taking the pills because his friend overdosed and died after taking the very same pills. Thus, this is not a case where the defendant did not know that he was distributing deadly fentanyl. Instead, Loza knew that the pills he was selling for profit could potentially kill the user, and he chose to sell them anyway. While it is perhaps admirable that Loza warned the CI to be careful, the fact that he sold pills he knew to be

---

[1] This Court sentenced Walker to three years' probation. *See* Dkt. No. 138.

U.S. SENTENCING MEMO.  
CR 19-00715-01 WHA  
3

deadly shows extraordinary disregard for the safety of this community.

The next two controlled purchases involved heroin. On September 10, 2019, the CI set up another deal with Loza, this one for an ounce of black tar heroin. The CI again went to the autobody shop where Loza worked in Pittsburg, and paid $600 for an ounce of heroin. Video recorded during the operation shows Loza weighing the heroin on a scale and then providing it to the CI. At the deal, Loza mentioned to the CI that he had two "birds" of heroin, which is code for kilograms, available for purchase. Loza then "fronted" the CI with an additional ounce of heroin, which means that he provided the CI with an ounce of heroin that the CI had not yet paid for, with the understanding that the CI would sell the heroin for a profit and then return to pay the money owed to Loza. The fact that Loza provided drugs to the CI in this manner suggests that Loza had steady and easy access to heroin and thus could "front" drugs to the CI. Finally, at the deal, Loza asked the CI for a favor, specifically to wire $3,000 to two individuals in Mexico. Law enforcement investigated these individuals in Mexico, and found multiple wires of funds to them from numerous individuals, but no other wires from Loza. This suggests they are not family or friends of Loza's, but rather are likely connected to manufacturers of drugs in Mexico who smuggle the drugs across the border and then transport them to dealers like Loza. Together, these facts—that Loza "fronted" an ounce of heroin, that he said that he had two more kilograms to sell, and that he had the CI wire $3,000 to Mexico—suggest that he was not a small-scale dealer but rather a large scale trafficker with access to large amounts of drugs.

A few weeks later, on September 27, 2019, Loza and the CI again met, this time so the CI could pay Loza back for the drugs Loza "fronted" him. At that meeting, Loza again gave the CI two more ounces of heroin that the CI was not expecting to receive, with the understanding that at some point in the future, the CI would pay Loza $1,200 for the drugs. This again suggests Loza had a significant amount of heroin and the ability to get more.

On October 17, 2019, the CI again went to the autobody shop in Pittsburg and paid Loza back for the heroin he received a few weeks earlier. At that deal, Loza told the CI he was expecting a shipment of $20,000 worth of blue "M30" pills, which are counterfeit pills meant to look like Oxycodone 30 mg pills that are in fact laced with fentanyl. A few days later, the CI and Loza agreed that Loza would ship $5,000 worth of counterfeit pills to the CI's "friend" in Texas, so long as Loza was paid in advance.

The CI provided Loza with $5,000, and heard Loza call someone on the phone and directed that person to prepare a "postcard," which the CI believed to be code for a package of drugs.

On October 24, 2019, Loza's co-defendant, Anthony Arasa[2], went to the Post Office in Concord, California and mailed a package with 500 counterfeit pills to a P.O. box in Texas that was controlled by law enforcement. The investigation revealed that Arasa mailed the package of pills on Loza's behalf. Text messages between Loza and Arasa show Loza asking him if he could "send a birthday card for me," which is code for the package of pills. The package arrived at the P.O. box in Texas and was recovered by law enforcement. Inside, officers found 500 pills that tested positive for fentanyl.

On November 22, 2019, the CI introduced Loza to the UC, who then purchased 500 more counterfeit fentanyl pills for $5,000. At the deal, Loza mentioned to the UC that he had 10,000 pills currently, saying he had "5,000 here and 5,000 in LA."

Finally, on December 12, 2019, law enforcements executed a search warrant at Loza's home. Inside, they found large amounts of different types of drugs, confirming that he is in fact a large-scale polydrug trafficker. Specifically, agents found: (1) 2,255 of the counterfeit M30 pills laced with fentanyl, found in a hollowed out leg of Loza's couch; (2) 181 grams of suspected heroin; (3) 147 grams of marijuana, along with packaging and labels indicating it was for sale; (4) three grams of suspected methamphetamine; and (5) $5,480 in cash.

**B.    Discussion**

The Court must consider the purposes of sentencing here – including both punishment and deterrence. The defendant was a large scale trafficker distributing fentanyl and heroin. He participated in four controlled purchases with the CI or the UC, each one for progressively larger amounts of drugs. Furthermore, Loza's behavior and comments, including "fronting" drugs to the CI, mentioning that he had large stashes of narcotics both here and in Los Angeles, and asking the CI to wire money to Mexico, suggest that Loza was not a small time, street-level dealer, but rather an important cog in the illegal importation, transportation, and distribution of drugs in our country. The drugs Loza sold, fentanyl and

---

[2] This Court declined to sentence Arasa and instead referred him to the ATIP program. *See* Dkt. No. 148. He completed the program successfully and was subsequently sentenced to time served. *See* Dkt. No. 208.

heroin, are dangerous opioids that have done unspeakable harm to our community, and have caused death, overdose, addiction, and ruin. Loza's conduct gravely compromised the health and safety of the community. He sold extremely large amounts (thousands of pills and ounces of heroin) that, if they had reached the streets, would have provided thousands of personal uses of both dangerous drugs to customers. Moreover, narcotics transactions—particularly those that involve large amounts of drugs and high dollar amounts—inevitably invite violence. While there is no allegation in this case that Loza or any of his co-defendants used weapons, threats, or intimidation to deal narcotics, that danger is always present in situations like the ones Loza fostered. The government believes that a significant custodial sentence is appropriate punishment for this serious and dangerous conduct.

On the other hand, the government acknowledges that there are important mitigating factors in this case. As a result, the government believes that a three-level downward variance to Loza's Guidelines range, leading to a Total Offense Level of 22, is appropriate. To begin, the defendant has suffered from substance abuse problems, and he reports that addiction is in part to blame for his drug trafficking behavior. Furthermore, while the defendant does have criminal history, the government notes that his most serious conviction occurred in 2000, when he was 19 years old (discharging a firearm from a vehicle). That offense is too old to count for criminal history purposes, and the rest of Loza's criminal history involves misdemeanor convictions involving a vehicle. While the government does not minimize this behavior, it notes that Loza has no felony convictions in the last 22 years. Finally, Loza quickly accepted responsibility for his criminal conduct. For these reasons, the government believes that a sentence at the low-end of the applicable Guidelines range after a three level downward variance is appropriate.

## III. CONCLUSION

The defendant engaged in significant and long-standing narcotics distribution activity, and conducted multiple narcotics transactions for thousands of dollars. For this serious and dangerous conduct, the government asks to Court to impose a sentence of 63 months, which is sufficient, and not greater than necessary, to achieve the goals of 18 U.S.C. § 3553(a). The government also recommends

//

//

the Court also impose three years of supervised release, no fine, and a $600 special assessment.

DATED: December 27, 2022                                Respectfully submitted,

                                                        STEPHANIE M. HINDS
                                                        United States Attorney


                                                        _____/s/_____
                                                        ROSS WEINGARTEN
                                                        Assistant United States Attorney